USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: August 11, 2016

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                                  :
    UNITED STATES OF AMERICA                                      :
                                                                  :
                                                                  :          15 Cr. 794 (KBF)
        - v. -                                                    :
                                                                  :          OPINION & ORDER
                                                                  :
    TIMMY WALLACE,                                                :
                                                                  :
                                       Defendant.                 :
                                                                  :
------------------------------------------------------------------X

KATHERINE B. FORREST, United States District Judge:

Before the Court are numerous motions filed by defendant Timmy Wallace.

Defendant moves primarily to suppress a firearm found subsequent to his arrest as

well as statements made and DNA collected from defendant subsequent to his

arrest.  Defendant also moves to dismiss his Indictment and moves for immediate

production of certain discovery material.

On May 25, 2015, NYPD officers pulled over defendant's vehicle for a

defective brake light.  During the stop, the officers searched the driver's side door of

defendant's vehicle and discovered that the required federal label containing a

vehicle identification number (VIN) was missing from the door.  After discussing the

missing label with defendant, defendant was arrested for violating New York Penal

Law § 170.70, illegal possession of a vehicle identification number.  A subsequent

search of defendant's vehicle at the 44th precinct revealed a firearm located under

the hood of defendant's vehicle.  Defendant was then charged with, and indicted for,

a federal felon-in-possession charge pursuant to the Armed Career Criminal Act ("ACCA"), 18 U.S.C. §§ 922(g), 924(e)(1), 924(2)(A).

Defendant moves to suppress the evidence principally on the grounds that:  1) the stop of defendant's vehicle was improper because the police lacked reasonable, articulable suspicion or probable cause to believe that a traffic violation had occurred; 2) the initial search of defendant's vehicle conducted during the traffic stop, which resulted in discovery of the missing federal label, was unlawful; 3) the officers lacked probable cause to arrest defendant under N.Y. Penal Law §170.70 because defendant did not possess the requisite scienter at the time of his arrest; and 4) the search of defendant's vehicle conducted at the precinct subsequent to his arrest, which resulted in discovery of the firearm, was an unlawful "investigatory search."  Defendant moves to dismiss the ACCA charge against him on the ground that one of the three prior convictions used to determine that defendant is a career offender no longer carries a maximum term of imprisonment of ten years or more.

The Court analyzes each of defendant's arguments separately – examining the legality of the car stop and initial search; the legality of defendant's arrest; and the legality of the search subsequent to defendant's arrest.  For the reasons set forth below, the Court DENIES defendant's various motions in their entirety.

I.    FACTUAL BACKGROUND

This motion has been vigorously litigated on both sides and the Court has reviewed briefing submitted by defendant's numerous counsel as well as the government's opposition.  The court held an evidentiary hearing held on July 12, 2016 and August 1, 2016.  Testimony was given by officers Harris Haskovic,

2

Michael Monahan, Alejandro Azcona, Sergeant Davon Alston, defendant Timmy Wallace, and others.

Overall, the Court finds the testimony given by NYPD officers Haskovic and Monahan to be generally credible and the testimony given by defendant to be generally not credible.  Several portions of defendant's testimony make little sense.  In addition, defendant's demeanor during the evidentiary hearing was unsupportive of someone who was being completely forthcoming.  Defendant had a flat affect and showed little to no emotion when being questioned about the events in question.  These general impressions of the Court influenced the specific factual findings detailed of the facts below.  Only those facts necessary to provide context and resolution of this motion are set forth herein.

    A.    The Traffic Stop

On May 25, 2015, defendant was driving a black Dodge Magnum with New York license plate number GSA 1334.  (See Government Exhibit "GX" 1.)  Defendant was working as a pizza delivery worker, and his vehicle had a Papa John's pizza sign on top.  (Jul. 12, 2016 Suppression Hr'g Tr. ("Jul. 12 Tr.") 30; Aug. 1, 2016 Suppression Hr'g Tr. ("Aug. 1 Tr.") 107.)  There were two passengers seated in the backseat of defendant's vehicle.  (Aug. 1 Tr. 138.)  Defendant testified that the two individuals were not helping with defendant's deliveries, but rather were along for the ride.  (Id.)  Defendant could not recall the full name of either individual, but recalled only that they were friends of a friend.  (Aug. 1 Tr. 108,

138.)  The Court finds this scenario rather strange and believes that defendant was likely not forthcoming about his relationship with the passengers.[1]

At approximately 7:20 p.m., NYPD officers Haskovic and Monahan, as well as Sergeant Alston, were traveling in a patrol car behind defendant's vehicle.  (Jul. 12 Tr. 30.)  Officer Haskovic testified that the officers' vehicle was stopped in traffic approximately two to three feet away from defendant's vehicle at the corner of Webster Avenue and East 173rd Street.  (Jul. 12 Tr. 25-27, 31.)

Officer Haskovic testified that when traffic started moving and then stopped again, defendant released and reapplied his brakes, such that officer Haskovic could see that only defendant's driver's side brake light was illuminated when defendant applied his brakes  (i.e., the passenger's side brake light was not illumined when defendant stopped and was thus defective).  (Id.)  The court credits this testimony, which was corroborated by the testimony of officer Monahan, (Jul. 12 Tr. 145), and Sergeant Alston, (Aug. 1 Tr. 59.), which the Court also finds credible.[2] Furthermore, Sergeant Alston's memo book, prepared by Sergeant Alston on May 25, 2015, shortly after the incident, also included a notation about defendant's brake light.  (GX 3503-3; see Aug. 1. Tr. 80).  Defendant testified that he did not know whether his brake lights were or were not functioning on May 25, 2015.  (Aug. 1 Tr. 140.)   The officers ultimately pulled over defendant's vehicle on the

---

[1] The Court notes that besides weighing on defendant's credibility, this fact is ultimately irrelevant for this motion.

[2] The government presented a video of a test of the vehicle's defective brake light.  (GX 16.)  The video further corroborates the testimony of the officers that defendant's brake light was defective. The Court notes that the video is not alone conclusive, however, because the recording was made two months after the defendant's car was in the government's custody.

southbound side of Webster Avenue for the defective brake light.  (Jul. 12 Tr. 26, 33.)[3]

B.   Defendant's Arrest

After pulling defendant over for a defective break light, officers Haskovic and Monahan approached the driver's side of defendant's vehicle.[4]  (Jul. 12 Tr. 33, 147.) They observed defendant in the driver's seat and the individuals in the backseat. (Jul. 12 Tr. 28, 146.)  They also observed that the outside of defendant's driver side door had tool/scratch marks on the top right corner.  (Jul. 12 Tr. 34, 148; GX 5.) Defendant concedes this point.  (Aug. 1 Tr. 141)  Both officers testified that these marks indicated to them that there may have been forcible entry into the vehicle. (Jul. 12 Tr. 35, 74, 148.)  Officer Haskovic described the car's condition as poor:  the windshield had broken glass and there were scratches and dents all over the car. (Jul. 12 Tr. 72-73)[5]

Upon the officers' request, defendant handed over his New York State driver's license but stated that he did not have a copy of his registration.  (Jul. 12 Tr. 34.)[6]  Defendant testified that he also provided a copy of his insurance card.

---

[3]      Officer Monahan was the officer driving the patrol vehicle. (Jul. 12. Tr. 161.) There was no dashboard or any other kind of video recording of this encounter.  (Jul. 12 Tr. 69.)

[4]      At the time, Sergeant Alston was inside the police vehicle having an unrelated telephone call with another officer. (Aug. 1 Tr. 61.)

[5]      Officer Haskovic testified that the pizza delivery sign was returned to the business, Papa John's, the day after these events. (Jul. 12 Tr. 70-71.)  Officer Haskovic testified that he observed a bag for carrying pizzas in the car, but no actual pizza boxes.  (Jul. 12 Tr. 71.)  He did not recall if there were any receipts in the car.  (Jul. 12 Tr. 71-72.)  Officer Monahan recalls seeing a pizza box in the car.  (Jul. 12 Tr. 171.)

[6]      Officer Haskovic testified that he was the one who asked defendant for his license and registration, but Officer Monahan also testified that he was the one who first approached defendant

(Aug. 1 Tr. 109.)  Officer Haskovic testified that he did not recall defendant providing him with an insurance card for the car.  (Jul. 12 Tr. 76.)[7]  Defendant testified that he asked if he could search for the registration in his glove compartment, and that officer Haskovic said that was unnecessary as officer Haskovic could just look at the windshield.  (Aug. 1 Tr. 135, 141.)

Officer Haskovic testified that he found defendant's inability to provide registration unusual, and looked towards the windshield of defendant's car for the car's registration sticker.  (Jul. 12 Tr. 35.)  Both he and officer Monahan observed that the registration sticker and the inspection sticker appeared to have been peeled off and taped back on to the car's windshield.  (Jul. 12 Tr. 35-36, 148-49; GX 6, 7.)  In addition, the surface of the stickers appeared abraded, and only 12 of the 17 digits of the VIN number printed on the registration sticker were legible.  (Jul. 12 Tr. 36, 80, 149; GX 6, 7.)[8]  The other legible components of the registration sticker included the vehicle's year (2005), model ("SUBN"), and only the first 5 of the 7 digits of the license plate.  (Jul. 12 Tr. 79; GX 6.)  Defendant testified that he had taped the stickers to the windshield with black tape, and then later replaced

---

and requested his license. (Jul. 12 Tr. 34, 172.)  Officer Monahan testified that both he and Haskovic asked defendant questions during the car stop.  (Jul. 12 Tr. 150.)

[7]    At the hearing, copies of the insurance card and registration were introduced into evidence. (Defendant's Exhibit "DX C.)  Defendant testified that the copies were obtained from the original documents that were in the glove compartment of his car and vouchered for release to his mother. (Aug. 1 Tr.at 132.)

[8]    Both officers Haskovic and Monahan testified that they observed the public VIN on the dashboard of the vehicle, and that the digits on the public VIN matched the legible digits of the digits printed on the registration sticker.  (Jul. 12 Tr. 81-83, 167; DX A.)

the black tape with clear tape.  (Aug. 1 Tr. 143; GX 6.)  Defendant testified that he was unaware that both stickers were self-adhesive and that he could apply them to the windshield without tape.  (Aug. 1 Tr. 143.)  Defendant also testified that the last time he had seen his registration and insurance stickers they were not in such poor condition.  (Aug. 1 Tr. 142.)

Because he found the condition of the registration and insurance stickers to be unusual, officer Haskovic asked defendant why the stickers were in such poor condition.  Defendant responded that he had previously sprayed ice defroster spray on the inside and outside of his windshield.  (Aug. 1 Tr. 114-15.)  Officer Haskovic testified that in his training and experience, he did not know of any defrosting agent that would cause such deterioration.  (Jul. 12 Tr. 37-38, 84.)  He also stated that he had never seen a registration sticker in this state before.  (Jul. 12 Tr. 37.)

The court finds that defendant's testimony about the condition of his registration and insurance stickers on his car windshield not credible.  As noted, defendant testified that he did not know the stickers were self-adhesive, but instead attempted had attached them with black tape and then later with clear tape.  The court believes that defendant's explanation stretches credulity and common sense. As also noted, defendant testified that he sprayed ice defroster on both the inside and outside of his windshield, which caused the stickers to discolor.  The Court finds it highly unlikely that anyone would use a defroster spray in such a manner; defendant's account is not credible.  The Court also finds it highly unlikely that defendant was unaware of the poor condition of the registration and insurance

stickers.  In addition, the Court does not credit defendant's testimony that officer Haskovic told defendant that officer Haskovic did not need Defendant's registration card because officer Haskovic could just look at Defendant's windshield.  Based on his experience and credible testimony, the Court does not believe officer Haskovic would have found defendant's registration sticker on the windshield to be an adequate replacement for a registration card with defendant's information.  The Court credits officer Haskovic and Monahan's testimony that the officers found the condition of the stickers — which were heavily effaced and appeared to have been peeled back and taped back on — to be suspicious.

Defendant further testified that at some point after officer Haskovic first approached him, Sergeant Alston approached defendant's car from the passenger side and, without permission, opened the passenger side door by reaching his hand through the window.  (Aug. 1 Tr. 113.)  Defendant testified that Sergeant Alston then opened the glove compartment over defendant's protest, stating that he wanted to check if defendant's registration was in the glove compartment.  (Aug. 1 Tr. 112-13.)  Defendant testified that in searching the glove compartment, Sergeant Alston's back was turned to the passengers in the vehicle.  (Aug. 1 Tr. 145) Sergeant Alston, on the other hand, testified that he never opened the door and never searched in the glove compartment.  (Aug. 1 Tr. 62.)  He also explained that standard NYPD practice was to not to conduct a search of the interior of a vehicle while the occupants are still inside because it was unsafe to do so.  (Aug. 1 Tr. 98.) The Court credits Sergeant Alston's testimony in this respect and finds that he did

not search defendant's glove compartment and would not have done so for safety reasons, particularly having to turn his back on the passengers.

At some point, officer Haskovic inquired as to the tool marks on the driver's side door of defendant's vehicle. Defendant stated that the marks were from when defendant had locked himself out of the vehicle. (Jul. 12 Tr. 38.) Next, officer Haskovic asked Defendant if defendant would allow the officer to open the driver's door to view the "federal label" or "federal sticker." (Jul. 12 Tr. 39.) Federal law, together with corresponding regulations, require that a label containing a vehicle's VIN be affixed next to the driver's seat on either "the hinge pillar, door-latch post, or the door edge that meets the door-latch post, next to the driver's seating position . . . ." See 49 U.S.C. § 32101; 49 C.F.R. § 567.4; see also (July. 12. Tr. 21, 142-43) The parties agree that the door was ultimately opened, but disagree as to how it became opened. Defendant testified that he did not give consent, but rather that officer Haskovic walked up to his door after taking defendant's license back to the patrol car and opened defendant's door without asking for permission. (Aug. 1. Tr. 119.) Officer Haskovic testified that defendant agreed to open the door. (Jul. 12 Tr. 39, 89-90.)[9] Officer Monahan testified that defendant gave permission to open the door, and that officer Monahan and officer Haskovic opened the door. (Jul. 12 Tr. 150-51.) The court credits the testimony of officers Haskovic and Monahan that Defendant did give consent to open the door.

---

[9]    Officer Haskovic testified that he did not remember whether he or defendant ultimately opened the door. (Jul. 12. Tr. 39.)

It is also undisputed that defendant's driver side door was missing the federal label.  (Jul. 12 Tr. 40, GX 8.)  Officer Haskovic testified that defendant stated he knew the federal label had been on the door previously but did not know what had happened to it.  (Jul. 12 Tr. 42, 91.)  Officer Monahan recalled defendant stating that Defendant had purchased the car without the label.  (Jul. 12 Tr. 152.) The Court finds this testimony from both officers to be credible.  Defendant testified, in contrast, that prior to that conversation with officer Haskovic, defendant had no knowledge that the federal label was missing.  (Aug. 1 Tr. 123) Defendant testified that he did not know what a federal sticker or federal label was, and that he did not know what officer Haskovic was referring to when he asked about the "sticker" that was missing from defendant's door.  (Id.)  The Court finds defendant's testimony to be not credible.  In fact, the Court finds that defendant knew about federal stickers and knew that such stickers contained the car's VIN number.  The Court reaches this conclusion based in part on the deep knowledge of cars, VINs, federal stickers, and the law that defendant has demonstrated throughout this case and in his numerous personally written filings.[10] (See, e.g., ECF No. 14)  Defendant also acknowledged that he told officer Haskovic that defendant had previously seen car doors with stickers on them but did not know what happened to his.  (Aug. 1 Tr. 123, 148.)

---

[10] Defendant testified that he only began learning about VINs and federal stickers in connection with this case. (Aug. 1 Tr. 125-26).  The Court finds this testimony unbelievable for numerous reasons, including defendant's general lack of credibility and defendant's high level of specific knowledge about VINs demonstrated early in this case and in his multiple filings submitted to the Court.  See, e.g., ECF No. 14.

After asking defendant about his federal sticker, officer Haskovic asked defendant to step out of his vehicle and placed defendant under arrest for violating New York Penal Law § 170.70.  (Jul. 12 Tr. 42.)  The arrest occurred at 7:29 p.m. (Jul. 12 Tr. 104.)[11]  Sergeant Alston, the supervisor on scene, verified the arrest. (Jul. 12 Tr. 43-44.)[12]  No further search of defendant's vehicle was conducted at the scene when defendant was arrested.  (Jul. 12 Tr. 45, 152.)  The other two passengers in defendant's car were released.  (Jul. 12 Tr. 45.)  Defendant was placed in officer Azcona's transport vehicle and taken to the 44th precinct.  Officer Haskovic drove defendant's vehicle to the precinct.  (Jul. 12 Tr. 45-46, 191.)  It took approximately five minutes to travel to the precinct.  (Jul. 12 Tr. 108.)

Defendant alleges that the officers had ulterior motives for stopping defendant's car.  Such theory is speculative and unsupported by the evidence presented.  According to audit records from the NYPD, one of the officers on the scene performed an electronic verification of defendant's name using a "Rugby device" at 7:22 p.m.  (Aug. 1 Tr. 29; May 6, 2016 Ltr. from USA (ECF No. 49), at 1.) A Rugby device is a portable NYPD electronic device that allows officers to search law enforcement databases and programs.  The information returned provided verification of defendant's driver's license information, vehicle type, and license

---

[11]    Officer Haskovic testified that he had made one prior arrest for violation of N.Y. Penal Law § 170.70 and that he had pulled over motorists for defective brake lights approximately thirty times. (Jul. 12 Tr. 27, 44.)  Officer Monahan stated that he had participated in arrests for § 170.70 two times previously.  (Jul. 12 Tr. 182.)

[12]    Sergeant Alston testified that he did not remember if he saw the car door with the missing sticker but that it was not his practice to verify each piece of information relating to an arrest while acting as supervisor.  (Aug. 1. Tr. 56.)

plate; the verification also yielded a VIN number that matched the full public VIN on the dashboard of defendant's car and the partial VIN visible on the registration sticker. (Aug. 1 Tr. 38; DX B-1)

It is not clear who performed the verification. At some point during the stop, officer Azcona, who was patrolling in a separate vehicle, arrived at the scene. According to officer Azcona, he happened to see officers Haskovic and Monahan and Sergeant Alston with defendant's stopped car and offered his assistance unprompted.[13] (Jul. 12 Tr. 189, 193.) Officer Azcona had a Rugby device, and lent the device to the officers on the scene, who did not have such a device and whose vehicle did not have a working computer. (Jul. 12 Tr. 44-45, 67-68, 189-90.)[14] Officer Azcona was already logged into the device when he handed it to officer Haskovic. (Jul. 12 Tr. 197.) However, officer Haskovic did not remember anyone, including himself, running the defendant's information through the Rugby device prior to arresting defendant. (Jul. 12 Tr. 63-64, 70, 86-89.)[15] Sergeant Alston testified that he did not use the Rugby device and that he did not recall if anyone ran the Rugby device. (Aug. 1 Tr. 80.) Defendant also did not recall seeing anyone using the device. (Aug. 1 Tr. 118.)

---

[13]     Officer Monahan did not recall any other police personnel coming to assist with the stop. (Jul. 12 Tr. 162.) He did not recall whether they had a Rugby unit or whether defendant's information was run through it or not. (Jul. 12 Tr. 164-66.)

[14]     Officer Azcona testified that officer Haskovic asked to use the Rugby device. (Jul. 12 Tr. 194.) He also testified that officer Haskovic gave him the Rugby device back at the precinct. (Jul. 12 Tr. 199.)

[15]     Officer Aczona testified he did not know whether officer Haskovic actually used the device. (Jul. 12 Tr. 196.)

Importantly, officer Haskovic testified that even if an on-site verification of defendant's license plate and public VIN number produced matching results, officer Haskovic's concerns about defendant's vehicle would not necessarily have been alleviated.  (Jul. 12 Tr. 64.)[16]  Officer Haskovic testified that he was concerned that defendant's car could have been subject to a "VIN swap."  (Jul. 12 Tr. 64.)  To effect a VIN swap, an individual removes the VIN number from a damaged vehicle and places the number onto a stolen vehicle of a similar make and model in order to mask the stolen nature of the vehicle.  (Jul. 12 Tr. 23, 64-66.)  Officer Haskovic testified that he acquired knowledge about "VIN swap" schemes in his NYPD training on automobile crimes.  (Jul. 12 Tr. 66.)[17]  The Court credits officer Haskovic's testimony and does not believe that the officers had any ulterior motive when they pulled over defendant's vehicle.

C.    The Car Search Subsequent to Defendant's Arrest

Subsequent to defendant's arrest, officer Haskovic vouchered defendant's vehicle.  (Jul. 12 Tr. 46-48; GX 12.)  He indicated on the vehicle voucher that the vehicle was "arrest evidence," because the vehicle itself was evidence for the N.Y. Penal Code § 170.70 violation.  (Jul. 12 Tr. 48, 153.)

Officer Haskovic and officer Monahan also performed an inventory search of defendant's vehicle.[18]  (Jul. 12 Tr. 48, 52, 153.)  Both officers testified that they had

---

[16]    It is possible to run a partial VIN number through the NYPD databases.  (Jul. 12 Tr. 85-86.)

[17]    Officer Haskovic testified that he had never personally seen a vehicle that had a VIN swap. (Jul. 12 Tr. 66.)

[18]    Although officer Haskovic did not use the term "inventory search" in his grand jury testimony on May 28, 2015, no questions regarding "inventory searches" were posed to him.  At

been trained to perform such a search, which is routine procedure and allows the NYPD to account of property that must be safeguarded. (Jul. 12 Tr. 49-50, 154; <u>see</u> GX 15) Officer Haskovic testified that he began the inventory search of defendant's vehicle by checking the driver's seat area. (Jul. 12 Tr. 52, 108, 110.) At that time, officer Monahan was searching the interior rear of the vehicle. (Jul. 12 Tr. 52, 155.) officer Haskovic testified — and the Court credits — that officer Haskovic had two purposes when he then proceeded to check under the hood of defendant's vehicle: to continue the inventory search and to conduct an investigatory search of the confidential VIN number that should have been engraved on the engine block or transmission. (Jul. 12 Tr. 52-54, 94-95.) Officer Haskovic testified that he wanted to cross check the public VIN of the vehicle, which is on the dashboard of the car, against the engraved confidential VIN. (Jul. 12 Tr. 54.) The Court finds that officer Haskovic was clear and forthcoming about the purposes of his search.

At approximately 7:40 p.m., officer Haskovic opened the hood of defendant's car. (Jul. 12 Tr. 107) Officer Haskovic immediately noticed a black grocery bag hanging behind the passenger side headlight. (<u>Id.</u>) Officer Haskovic lifted the grocery bag and uncovered a black nylon zipper bag inside. (Jul. 12 Tr. 55-56; GX 10.) He unzipped the nylon bag and saw the butt of a handgun. (Jul. 12 Tr. 55.) Officer Haskovic then placed the bag back inside the car and called officer Monahan and his sergeant over. (Jul. 12 Tr. 55-57, 156.) Officer Haskovic then notified the

---

defendant's parole revocation hearing on June 15, 2015, officer Haskovic referenced conducting an inventory search of defendant's vehicle. (Jul. 12 Tr. 118-121.)

evidence collection team and halted the inventory process until they arrived.  (Jul. 12 Tr. 55, 110.)

Officer Haskovic testified that after the evidence collection team left, he continued to complete the inventory search of defendant's vehicle, which yielded a number of objects such as a tee shirt, a flashlight, and wires.  (Jul. 12 Tr. 60-61, 110.)  He vouchered the firearm first.  (Jul. 12 Tr. 111-12.)  The remaining property found in the vehicle was vouchered later on by officer Haskovic; officer Monahan was not involved in the later process.  (Jul. 12 Tr. 110-156, 181.)[19]

## II.    STANDARD OF REVIEW

 "It is well established that the burden of production and persuasion generally rest upon the movant in a suppression hearing."  United States v. Arboleda, 633 F.2d 985, 989 (2d Cir. 1980).  "The movant can shift the burden of persuasion to the government and require it to justify its search, however, when the search was conducted without a warrant."  Id.  A warrantless search is presumptively unreasonable and "subject only to a few specifically established and well-delineated exceptions."  United States v. Kiyuyung, 171 F.3d 78, 83 (2d Cir. 1999).  At a suppression hearing, the burden must be met by "no greater burden than proof by a preponderance of the evidence."  United States v. Matlock, 415 U.S. 164, 178 (1974).

---

[19] Officer Haskovic also testified that he ran the public VIN number of defendant's vehicle at the stationhouse.  (Jul. 12 Tr. 63.)  There is no evidence that any information associated with the car did not match that which was registered to defendant.

III.   DISCUSSION

"The Fourth Amendment protects the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" Davis v. United States, 564 U.S. 229, 236 (2011).  If the Court finds that a search or seizure violated the Fourth Amendment, the next step is to determine whether the evidence obtained as a result of that illegal search or seizure ought to be suppressed pursuant to the exclusionary rule.  The exclusionary rule is "a deterrent sanction that bars the prosecution from introducing evidence obtained by way of a Fourth Amendment violation." Davis, 564 U.S. at 231–32; see also Mapp v. Ohio, 367 U.S. 643 (1961).  "[T]he exclusionary rule encompasses both the 'primary evidence obtained as a direct result of an illegal search or seizure' and . . . 'evidence later discovered and found to be derivative of an illegality,' the so-called 'fruit of the poisonous tree.'" Utah v. Strieff, 136 S. Ct. 2056, 2061 (2016) (quoting Segura v. United States, 468 U.S. 796, 804 (1984)).  Because the exclusionary rule is a "prudential" doctrine, see Davis, 564 U.S. at 236, it is "applicable only . . . where its deterrence benefits outweigh its substantial social costs," as "suppression of evidence . . .  has always been our last resort, not our first impulse," Strieff, 136 S. Ct. at 2061 (quoting Hudson v. Michigan, 547 U.S. 586, 591 (2006)).  Because defendant challenges various aspects of the officers' conduct that resulted in the ultimate discovery of the firearm in defendant's vehicle, the Court discusses the legal principles associated with each issue.

A.     The Traffic Stop and Initial Search of Defendant's Vehicle

Defendant first challenges the legality of the traffic stop and initial search of his vehicle during such stop. "The temporary detention of an individual during a traffic stop is subject to limitation under the Fourth Amendment as a 'seizure' of the person." Holeman v. City of New London, 425 F.3d 184, 189 (2d Cir. 2005) (citing Whren v. United States, 517 U.S. 806, 809–10 (1996)).  The "Fourth Amendment requires that an officer making [a traffic] stop have probable cause or reasonable suspicion that the person stopped has committed a traffic violation or is otherwise engaged in or about to be engaged in criminal activity." Id. at 189 (2d Cir. 2005); see also United States v. Jenkins, 452 F.3d 207, 212 (2006); United States v. Gomez, 2016 WL 4083427, at *8 (S.D.N.Y. July 29, 2016).  "Whether probable cause or reasonable suspicion exists is an objective inquiry; the 'actual motivations of the individual officers involved' in the stop 'play no role' in the analysis." Holeman, 425 F.3d at 190 (quoting Whren, 517 U.S. at 813).

As discussed above, based on the credible testimony of officer Haskovic, which was corroborated by the credible testimony of officer Monahan and Sergeant Alston, as well as a video, the Court finds that on May 25, 2015, defendant was operating his vehicle with a defective brake light and that the officers stopped defendant's vehicle because of his defective brake light.  Defendant does not contest that driving with a defective brake light is a traffic violation.  The Court therefore concludes that the officers' stop of defendant's vehicle was justified by reasonable suspicion.  While defendant argues that he was stopped not for the defective brake light but rather because of the officers' subjective motivation to search Defendant's

car for contraband, such motivation — even if true — does not defeat the legality of the stop.  United States v. Dhinsa, 171 F.3d 721, 725-26 (2d Cir. 1999).

      B.    Defendant's Arrest

Defendant next challenges his arrest.  The legality of defendant's arrest — which led to the subsequent search of his car at the precinct — turns on probable cause.  "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."  Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001).  Probable cause exists if "the law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested."  United States v. Patrick, 899 F.2d 169, 171 (2d Cir. 1990).  As the Supreme Court has noted, "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules."  Illinois v. Gates, 462 U.S. 213, 232, (1983).  An officer is "is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest."  Martinez v. Simonetti, 202 F.3d 625, 635-36 (2d Cir. 2000).

Defendant was arrested pursuant to N.Y. Penal Law §170.70, which provides:

    A person is guilty of illegal possession of a vehicle identification number when:

(1) He knowingly possesses a vehicle identification number label, sticker or plate which has been removed from the vehicle or vehicle part to which such label, sticker or plate was affixed by the manufacturer in accordance with 49 U.S.C. section 32101, et seq. and regulations promulgated thereunder or in accordance with the provisions of the vehicle and traffic law; or

(2) He knowingly possesses a vehicle or vehicle part to which is attached a vehicle identification number label, sticker or plate or on which is stamped or embossed a vehicle identification number which has been destroyed, covered, defaced, altered or otherwise changed, or a vehicle or vehicle part from which a vehicle identification number label, sticker or plate has been removed, which label, sticker or plate was affixed in accordance with 49 U.S.C. section 32101, et seq. or regulations promulgated thereunder, except when he has complied with the provisions of the vehicle and traffic law and regulations promulgated thereunder; . . . .

N.Y. Penal Law § 170.70.  Defendant does not dispute that the federal label was indeed missing from the driver's side door of his vehicle.

Instead, defendant first contends that that a missing federal label cannot constitute a violation of § 170.70.  This argument is contradicted by the plain text of Section 170.70.  That section criminalizes knowing possession of a "vehicle part from which a vehicle identification label, sticker or plate has been removed, which label sticker, or plate was affixed in accordance with 49 U.S.C. section 32101, et seq., or regulations promulgated thereunder."  N.Y. Penal Code § 170.70(2).  And 49 U.S.C. Section 32101, together with corresponding regulations, require that the federal label, which contains the VIN, be affixed next to the driver's seat on either "the hinge pillar, door-latch post, or the door edge that meets the door-latch post, next to the driver's seating position . . . ."  See 49 C.F.R. § 567.4.  The case law cited by defendant in support of his position concerned a prior version of Section 170.70

that contained different language from the current statute.  See, e.g., People v. Sullivan, 137 Misc. 2d 909 (N.Y. Sup. Ct. 1987).

Defendant next argues that the officers illegally opened defendant's driver side door and that the officers lacked probable cause to believe that defendant's vehicle was stolen or that defendant had violated N.Y. Penal Law § 170.70.  The Court concludes that the opening of defendant's driver side door was a legal search, and that the officers had probable cause to believe that defendant had violated Section 170.70.  It is irrelevant whether the officers had probable cause to believe that defendant's vehicle was stolen.

As previously noted, the court credits officer Haskovic's testimony, corroborated by officer Monahan's testimony, that defendant gave consent to open the door.  "It is . . . well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."  Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); see also Gomez, 2016 WL 4083427, at *11.  During the suppression hearing held on August 1, 2016, counsel for defendant argued for the first time that any consent given by defendant was not knowing and voluntary.  (Aug. 1 Tr. 234).

"The government has the burden of proving, by a preponderance of the evidence, that a consent to search was voluntary."  United States v. Calvente, 722 F.2d 1019, 1023 (2d Cir. 1983).  The Court finds that the government has met this burden.  "Voluntariness is a question of fact determined by a 'totality of all the circumstances.'"  Gomez, 2016 WL 4083427, at *1 (quoting Schneckloth, 412 U.S. at

20

227).  "The ultimate question presented is whether the officer had a reasonable basis for believing that there had been consent to the search."  Id. (quoting United States v. Garcia, 56 F.3d 418, 423 (2d Cir. 1995)).  Defendant is fluent in English and has had prior interactions with the police.  In fact, defendant testified during the suppression hearing that he knew the police were prohibited from unilaterally searching his car.  (Aug. 1 Tr. 113).  There is no indication that the officers pressured or coerced defendant in any manner.  Considering all of the evidence presented, it was objectively reasonable for the officers to believe that defendant had given informed consent for the officers to open defendant's door.

As detailed in the Factual Background, supra, once officer Haskovic discovered that defendant's driver-side door was missing the federal label containing the VIN number, officer Haskovic confirmed that defendant knew the federal label was missing.  (Jul. 12 Tr. 42, 91.)  Defendant also told officer Monahan that defendant purchased the car without the federal label.  (Jul. 12 Tr. 152.)  At this point, the officers had probable cause to arrest defendant for a Section 170.70 violation because defendant "knowingly possessed a . . . vehicle part from which a vehicle identification label, sticker or plate has been removed, which label sticker, or plate was affixed in accordance with 49 U.S.C. section 32101, et seq., or regulations promulgated thereunder."  N.Y. Penal Code § 170.70(2).  The government has demonstrated that defendant had the required scienter at the time of his arrest.  "Knowing possession means what it says: the person must know the vehicle is missing the VIN."  Cook v. Sheldon, 41 F.3d 73, 78 (2d Cir. 1994).

C.  The Car Search Subsequent to Defendant's Arrest

Defendant challenges the legality of the car search conducted at the precinct subsequent to his arrest, which resulted in the discovery of a firearm in defendant's vehicle.  "It is well recognized in Supreme Court precedent that, when law enforcement officials take a vehicle into custody, they may search the vehicle and make an inventory of its contents without need for a search warrant and without regard to whether there is probable cause to suspect that the vehicle contains contraband or evidence of criminal conduct."  United States v. Lopez, 547 F.3d 364 (2d Cir. 2008) (citing Illinois v. Lafayette, 462 U.S. 640, 643 (1983)).  "An inventory search pursuant to standardized procedures will be upheld unless there is a showing that the government acted in bad faith or searched the car for the sole purpose of investigation."  United States v. Arango-Correa, 851 F.2d 54, 59 (2d Cir. 1988).  Importantly, under the inventory search doctrine, "law enforcement officials may open closed containers as part of an inventory search so long as they act in good faith pursuant to standardized criteria . . . or established routine."  United States v. Mendez, 315 F.3d 132, 137 (2d Cir. 2002).  "The existence of such a valid procedure may be proven by reference to either written rules and regulations, or testimony regarding standard practices."  Id.  But "[t]he Fourth Amendment does not permit police officers to disguise warrantless, investigative searches as inventory searches."  United States v. Lopez, 547 F.3d 364, 372 (2d Cir. 2008).  Defendant claims that the search was not an inventory search but rather an unlawful "investigatory search."

The Court rejects defendant's argument.  As already established, officers Haskovic and Monahan credibly testified that they performed an inventory search of defendant's vehicle.  (Jul. 12 Tr. 48, 52, 153.)  During the suppression hearing, the government presented evidence identifying standard procedures of the NYPD pertaining to automobile inventory searches.  (See Jul. 12 Tr. 49-50, 154; GX. 17).  These procedures instruct officers to thoroughly search the interior of a vehicle, including under the hood, and permit officers to open closed containers.  Id.  Officer Haskovic credibly testified that he had received training on how to conduct an inventory search and had been following the NYPD standard procedures regarding inventory searches when he searched defendant's vehicle.  (Jul. 12 Tr. 47)  The Court concludes that the inventory search of defendant's vehicle was proper.

It is true that office Haskovic also testified that he was also conducting a further investigation of defendant's vehicle to attempt to locate one of the vehicle's confidential VINs.  (Jul. 12 Tr. 49, 94)  But "[a]n otherwise-reasonable inventory search will not be rendered unreasonable merely because an officer is motivated in part by investigatory purposes or by the expectation that the search will yield evidence."  Bryant v. Vill. of Greenwood Lake, 2013 WL 5952610, at *4 (S.D.N.Y. Nov. 6, 2013), aff'd sub nom. Bryant v. Dasilva, 582 F. App'x 56 (2d Cir. 2014).  The subjective investigatory motivation of an officer does not normally defeat the legality of an otherwise proper inventory search.  "When officers, following standardized inventory procedures, seize, impound, and search a car in circumstances that suggest a probability of discovering criminal evidence, the

23

officers will inevitably be motivated in part by criminal investigative objectives.
Such motivation, however, cannot reasonably disqualify an inventory search that is
performed under standardized procedures for legitimate custodial purposes."
Lopez, 547 F.3d 364, 372 (2d Cir. 2008).  The Court finds that the legality of the
otherwise reasonable inventory search conducted by officers Haskovic and Monahan
was not altered by any investigatory motive the officers may have possessed.

Even if the Court determined that officer Haskovic had an impermissible
investigatory motive while conducting the search of defendant's vehicle that led to
the discovery of the firearm, evidence of the firearm would not be surpassed because
it would have been inevitably discovered.  "Under the inevitable discovery doctrine,
evidence that is illegally obtained will not be suppressed if the government can
prove that the evidence would have been obtained inevitably even if there had been
no statutory or constitutional violation."  Mendez, 315 F.3d at 137.  In the inventory
search context, the inevitable discovery doctrine allows for the admission of
otherwise impermissibly obtained evidence where the government proves: "(1) that
the police had legitimate custody of the vehicle or other property being searched, so
that an inventory search would have been justified; (2) that when the police in the
police agency in question conducted inventory searches, they did so pursuant to
'established' or 'standardized' procedures, and (3) that those inventory procedures
would have 'inevitably' led to the 'discovery' of the challenged evidence."  Id.
(citations omitted); see also United States v. Cancel, 2016 WL 929340, at *7-10
(S.D.N.Y. Mar. 9, 2016).

24

Here, it has already been established that the officers had legitimate custody of Defendant's vehicle after defendant was arrested. It has also been established that the NYPD conducts inventory searches pursuant to standard procedures, and that officer Monahan, in addition to officer Haskovic, was engaging in an inventory search of defendant's vehicle. Lastly, such procures would have inevitably led to the discovery of the black bag located behind defendant's head light, as well as the firearm inside such bag. This is true regardless of any investigatory motives officer Haskovic may have had.

The Court also notes that because defendant's arrest and the subsequent search under the hood of defendant's vehicle were lawful, defendant's fleeting arguments that his statements and DNA must be suppressed are without merit.

D.     The ACCA

Defendant also argues that he should not have been indicted pursuant to the Armed Career Criminal Act ("ACCA"). See 18 U.S.C. § 924(e). For the reasons set forth below, the Court rejects this argument.

The ACCA mandates that individuals who are convicted of violating 18 U.S.C. § 922(g) and who "ha[ve] three previous convictions . . . for a violent felony or a serious drug offense, or both, committed on occasions different form one another," be sentenced to at least fifteen years' imprisonment. Id. § 924(e)(1). A prior state controlled substance conviction is considered a "serious drug offense" under the statute if "a maximum term of imprisonment of ten years or more is prescribed by law" for the offense." Id. § 924(e)(2)(A)(ii).

Here, defendant's ACCA Indictment was based on defendant's instant felon-in-possession charge pursuant to 18 U.S.C. § 922(g) and three previous convictions for serious drug offenses.  See 18 U.S.C. § 924(e).  Specifically, defendant had the following three prior convictions under New York law:

1) On January 20, 2010, criminal sale of controlled substance in the 2nd degree, a Class A-II felony, in violation of New York Penal Law § 220.41(1);

2) On June 12, 2001, criminal sale of controlled substance in the 3rd degree, a Class B felony, in violation of New York Penal Law § 220.39(1); and

3) On April 15, 1999, criminal sale of controlled substance in the 3rd degree, a Class C felony, in violation of New York Penal Law § 220.39(1).

Nevertheless, defendant argues that the ACCA charge should be dismissed because his 2001 conviction no longer qualifies as a serious drug offense following the Drug Reform Law Act of 2009 ("DRLA"), which reduced the maximum penalty for class B drug felonies from 25 years to 9 years and provided for resentencing of previously convicted offenders under certain circumstances.  See N.Y. Penal Law § 70.70(2)(a)(i); N.Y. Crim. Proc. Law § 440.46(1).[20]

In McNeil v. United States, 563 U.S. 816 (2011), the Supreme Court explained that in determining whether a prior conviction qualifies as a "serious drug offense," the Court must "consult the maximum sentence applicable to a

---

[20] Defendant is not eligible for resentencing under the DLRA because he is not currently serving a sentence in New York State custody.  And Although the DRLA also lowered the maximum sentence for Class C felonies such as defendants 1999 conviction from 15 years to 5 and a half years, the reduction was not retroactive and only applied to offenses committed after the passage of the DRLA in 2004.

defendant's previous drug offense at the time of his conviction for the offense." <u>Id.</u> at 820 (2011).  However, the <u>McNeil</u> Court noted that it was not addressing "a situation in which a State subsequently lowers the maximum penalty applicable to an offense and makes that reduction available to defendants previously convicted and sentenced for that offense." <u>Id.</u> at 825 n.1; <u>see also</u> <u>United States v. Jackson</u>, 2013 WL 4744828 (S.D.N.Y. Sept. 4, 2013).  Relying on <u>McNeil</u>, defendant argues that because the DLRA lowered the maximum sentence for class B drug felonies to 9 years, the Indictment should be dismissed.

The Court disagrees.  Even after the passage of the DLRA, defendant would still be facing a maximum term of imprisonment of twelve years for his 2001 conviction.  Such conviction was defendant's second felony drug conviction.[21]  The current authorized maximum sentence for a second felony drug offender "shall not exceed twelve years" where the offense at issue is a class B felony, such as defendant's.  N.Y. Penal Law § 70.70(3)(b)(i); <u>see also</u> <u>People v. Bennett</u>, 911 N.Y.S.2d 694 (N.Y. County Ct. 2010).  Therefore, even after the DLRA, defendant would be facing a maximum sentence that exceeds 10 years and such conviction qualifies as a serious drug offense under the ACCA.

E.     Defendant's Discovery Demands

The discovery available in a criminal matter is governed by the Federal Rules of Criminal Procedure, several key cases including <u>Brady v. Maryland</u>, 373 U.S. 83,

---

[21] New York Penal Law § 70.70(1)(b) defines "Second felony drug offender" as a "second felony offender . . . who stands convicted of any felony, defined in article two hundred twenty or two hundred twenty-one of this chapter other than a class A felony."  Defendant's 1999 Conviction is for a class C felony defined in article 220 of the New York Penal Code.

(1963) and <u>Giglio v. United States</u>, 405 U.S. 150 (1972), and the "Mencks Act," 18 U.S.C. § 3500.

Rule 16 of the Federal Rules of Criminal Procedure provides, in pertinent part, that a defendant is entitled to obtain from the government documents and objects that are "within the government's possession, custody, or control" if they are "material to preparing the defense" or will be used by the government in its case-in-chief at trial.  Fed. R. Crim. P. 16(a)(1)(E).

Evidence that the government does not intend to use in its case-in-chief at trial is material "if it could be used to counter the government's case or to bolster a defense; information not meeting either of those criteria is not to be deemed material within the meaning of the Rule."  <u>United States v. Stevens</u>, 985 F.2d 1175, 1180 (2d Cir. 1993).  Rule 16(a) is not — and never was — "intended to provide the defendant with access to the entirety of the government's case against him."  <u>United States v. Percevault</u>, 490 F.2d 126, 130 (2d Cir. 1974) (citation omitted).  "Discovery of evidence in criminal prosecutions is, inevitably, more restricted than discovery in civil cases."  <u>United States v. Tolliver</u>, 569 F.2d 724, 728 (2d Cir. 1978).  Rule 16 "does not entitle a criminal defendant to a 'broad and blind fishing expedition among [items] possessed by the Government on the chance that something impeaching might turn up.'"  <u>United States v. Larranga Lopez</u>, No. 05 Cr. 655 (SLT), 2006 WL 1307963, at *8 (E.D.N.Y. May 11, 2006) (alteration in original) (citing <u>Jencks v. United States</u>, 353 U.S. 657, 667 (1957)).

The Jencks Act provides that "[a]fter a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement . . . of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified."  18 U.S.C. § 3500(b).  The plain meaning of this provision does not require production of 3500 material before trial.  In practice, however, courts in this district require the government to produce 3500 material at least the Friday prior to the commencement of trial and sometimes earlier.

The Jencks Act is intended to provide the defense with prior statements of government witnesses for purposes of impeachment.  United States v. Carneglia, 403 F. App'x 581, 586 (2d Cir. 2010).  The Jencks Act is not a general discovery device.  See United States v. Exolon-Esk Co., No. 94-CR-17S, 1995 WL 46719, at *2 (W.D.N.Y. Jan. 19, 1995) (citing In re United States, 834 F.2d 283, 286 n.2 (2d Cir. 1987)); see also United States v. Jackson, 345 F.3d 59, 76 (2d Cir. 2003) (The Jencks Act "does not normally mandate disclosure of statements made by a person who does not testify." (citations omitted)).

"There is no general constitutional right to discovery in a criminal case, and Brady did not create one."  Weatherford v. Bursey, 429 U.S. 545, 559 (1977); see also Pennsylvania v. Ritchie, 480 U.S. 39, 59 (1987) ("Defense counsel has no constitutional right to conduct his own search of the [Government's] files to argue relevance." (citation omitted)); United States v. Evanchik, 413 F.2d 950, 953 (2d Cir. 1969) ("Neither [Brady] nor any other case requires the government to afford a

criminal defendant a general right of discovery."); United State v. Meregildo, 920 F.
Supp. 2d 434, 440 (S.D.N.Y. 2013) ("Brady is not a rule of discovery—it is a
remedial rule." (citing United States v. Coppa, 267 F.3d 132, 140 (2d Cir. 2001))).
Rather, Brady established that the government has a constitutional obligation to
disclose favorable and material information to the defendant.  See Brady v.
Maryland, 373 U.S. 83, 87 (1963).

 "Brady material that is not 'disclosed in sufficient time to afford the defense
an opportunity for use' may be deemed suppressed within the meaning of the Brady
doctrine."  United States v. Douglas, 525 F.3d 225, 245 (2d Cir. 2008) (alteration
omitted) (quoting Leka v. Portuondo, 257 F.3d 89, 103 (2d Cir. 2001)); see also
Coppa, 267 F.3d at 135 ("Brady material must be disclosed in time for its effective
use at trial." (citation omitted)).  Brady material buried within significant amounts
of 3500 material and provided too close to trial to permit effective use may — under
certain circumstances — also be deemed suppressed.  See Douglas, 525 F.3d at 245;
see also United States v. Rittweger, 524 F.3d 171, 181 n.4 (2d Cir. 2008)
("Complying with the Jencks Act . . . does not shield the government from its
independent obligation to timely produce exculpatory material under Brady . . . .").

 Defendant moves for an order directing the government to produce Brady and
Giglio materials, certain witness statements, as well as evidence under Fed. R.
Evid. 404(b).  (Def's Memo. of Law in Support of Def's Supplemental Motions, ECF
Nos. 60, 61, 62, at 12-15.)  Defendant's motion requests discovery of 13 broad
categories of documents and information including, generally: (1) police reports and

notes indicating that the stop of defendant occurred based on knowledge that law enforcement had prior to the stop; (2) police radio run recordings, transcript of radio run recordings relates to the stop; (3) police notes and interviews done subsequent to defendant's arrest; (4) prior inconsistent statements including attorney proffers; and (5) statements or reports reflecting witness statement variations.  Defendant also moves for immediate production of all other <u>Brady</u> and <u>Giglio</u> material.

The 13 discovery requests cast a broad net.  The net is broader than that which the rules allow without particular rationale.  No such rationale has been provided.  In light of the absence of rationale, the Court does not find it necessary to discuss the requests on an individual basis.  Instead, it states certain propositions generally applicable to its determination.

First, the government has <u>Brady</u> obligations with which it must comply.  The government has stated that it is aware of those obligations — and the Court finds no basis to believe that it has not met them or will not continue to meet them.  As set forth in the discussion of the law, <u>Brady</u> is not a general discovery device and cannot justify the discovery sought herein.

Second, the government also has <u>Giglio</u> and Jencks Act obligations.  It is aware of those obligations, and the Court has no reason to doubt that it will comply with them at the appropriate time and in accordance with the Court's order dated August 2, 2016 (ECF No. 88) — sufficiently in advance of trial so as to give defense counsel adequate time to prepare for cross-examination of government witnesses.  Defendant's demand that <u>Giglio</u> and 3500 material be provided at this pre-trial

stage is premature.  No particular rationale has been presented which would justify such an unusually early production.

Third, defendant is entitled to certain discovery pursuant to Rule 16.  The government has represented that it has complied with its Rule 16 obligations.  In particular, the government has already provided the defendant with a copy of a video brake light test that was conducted on defendant's vehicle.  The government has also represented that pursuant to Federal Rule of Evidence 404(b)(2), it will provide reasonable notice of any evidence it plans to offer under Rule 404(b) prior to trial and in accordance with the Court's schedule.

IV.    CONCLUSION

For these reasons, defendant's motions are DENIED in their entirety.

SO ORDERED:

Dated:        New York, New York
              August 11, 2016

_____
      KATHERINE B. FORREST
      United States District Judge

32